No. 37,771

HELEN WATERBURY, *Appellee*, v. RISS & COMPANY, INC.; ROCKY MOUNTAIN INDUSTRIES, INC., *Appellant;* COUNTRY CLUB DISTRIBUTING COMPANY, INC., *Appellant;* JAKE BURKHARDT, MORRIS SIGMAN, SAM SIGMAN, SAM E. RUDD, ELENORE RUDD, LEONARD A. LEVAND and CELIA LEVAND, *Appellants*.

(219 P. 2d 673)

272

Opinion filed June 10, 1950.

*J. B. Patterson,* of Wichita, argued the cause, and *A. W. Hershberger, Richard Jones, Wm. P. Thompson,* and *H. E. Jones,* all of Wichita, were with him on the briefs for the appellants Jake Burkhardt, Morris Sigman, Sam Sigman, Sam E. Rudd, Elenore Rudd, Leonard A. Levand, and Celia Levand.

*Eugene G. Coombs* argued the cause, and *Paul V. Smith, Douglas E. Shay, Robert F. Hudson,* and *Malcolm C. Black,* all of Wichita, were with him on the briefs for the appellant Rocky Mountain Industries, Inc.

*Vincent F. Hiebsch,* of Wichita, argued the cause, and *Milton Zacharias, Eugene L. Pirtle, Kenneth H. Hiebsch, J. R. Sheedy* and *Lester C. Arvin,* all of Wichita, were with him on the briefs for the appellant Country Club Distributing Co., Inc.

*Emmet A. Blaes,* of Wichita, argued the cause, and *W. D. Jochems, J. Wirth Sargent, Roetzel Jochems, Robert G. Braden, S. C. Durbin,* and *E. P. Villepigue,* all of Wichita, were with him on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: Plaintiff brought this action pursuant to G. S. 1947 Supp. 60-3203 for the alleged wrongful death of her husband, Charlie Frederick Waterbury, hereinafter called Waterbury, alleged to have resulted from the negligence of defendants as joint tort feasors. The action was brought for the benefit of plaintiff and Charlene Waterbury, aged eleven years, Waterbury's daughter by a former marriage. Riss & Company, Inc., was found by the jury not to be guilty of any negligence which resulted in Waterbury's death and no judgment was rendered against it. Each of the other defendants was found to be guilty of negligence which contributed to his death and judgment was rendered against them for the sum of $12,000. Each of them defended separately and have separately appealed.

We first set out the general statement shown by the record of the relationship of the parties and of the circumstances which resulted in the death of Waterbury. Details will be supplied later, as the necessity therefor appears. Some years prior to the incidents which gave rise to this action Jake Burkhardt, Morris Sigman, Sam Sigman, Sam E. Rudd, Elenore Rudd, Leonard A. Levand and Celia

Levand bought the property formerly owned and used by the Jacob Dold Packing Company, which had ceased doing business at Wichita, and hold title thereto as tenants in common. They transacted their business under the name of Burkhardt & Sigman, and hereinafter will be so referred to. This property consists of about eleven acres of land upon which there are about fifteen buildings, most of them large, suitable for the storage of varied types of dry merchandise. Some of these owners lived in Denver, Colorado, and others in Wichita. One of them, Sam E. Rudd, was their manager. He had an office in one of the buildings and was there daily, or at such times as he needed to be, to look after and manage the property. One of these buildings is known as building "J." It is a brick building, 125 feet square, with a brick wall through its center from north to south, through which were two openings for the transfer of merchandise from one side of the building to the other. The buildings were served with railroad tracks and with driveways for trucks and other vehicles. Along the east side of building "J" is a room spoken of as an annex to building "J" which is 125 feet long and 16 feet wide. It had an opening about the center on the east and another one on the south, and also two openings in the wall between it and building "J." At the time of Waterbury's death all of these openings were closed except the one on the east. This annex was originally constructed of lumber on the east side and both ends. At sometime thereafter, but prior to the incident which gives rise to this action, Burkhardt & Sigman had rebuilt those walls of the annex with cement blocks, used also for the foundation of the walls, which were covered with stucco on the outside. The floor of the building was made of bridge planks and so situated as to be from two to four feet above the ground and from near the center of the building for its full width, and for about thirty feet south there was an excavation under the floor six or eight feet deep.

Under the date of April 26, 1947, Burkhardt & Sigman executed a written lease to the Rocky Mountain Industries, Inc., hereinafter called Rocky Mountain, for building "J" for a term of five years, and on the same date gave it written authority to sublet a part of the property. These instruments will be referred to later.

Rocky Mountain was operating a truck line depot and warehouse storage business and had for its manager Frank Barthelme. It had some business arrangement with Riss & Company which had trucks and a certificate authorizing it to haul merchandise. The specific

terms of that relationship are not shown by the abstract and are not important here.

In November, 1947, Rocky Mountain orally leased the annex from month to month for a monthly rental of $110 to the Country Club Distributing Company, Inc., hereafter called Country Club. This is a Kansas corporation with headquarters at Wichita and was engaged in the wholesale distribution of Country Club beer in case lots, which they purchased in St. Joseph or Kansas City, Missouri, and had delivered to Wichita in trucks under a contract with the G. & W. Truck Lines, hereinafter called G. & W., which did a freight trucking business and had the appropriate state and federal certificates for conducting that business. G. & W. had trucks for the hauling of merchandise, but did not have a truck tractor and had an agreement with B. F. McReynolds for the rent of his truck tractor and the services of a driver. In hauling the beer McReynolds usually drove the truck himself. He also managed a filling station in Wichita. Waterbury was employed by McReynolds in operating the filling station. On the morning of the tragedy McReynolds had returned from St. Joseph with a truck load of beer which he had transported for G. & W. for Country Club. Under McReynold's agreement with G. & W. he was to assist in loading and unloading the cargo hauled. That morning he had something else to do and told Waterbury to deliver the truck load of beer to the annex for Country Club.

At that time cases of beer had been stored in the north end of the annex eight cases high, and near the wall at the south end the parties were storing beer in the aisle between the walls when the floor gave way. The cases of beer fell into the aisle and upon Waterbury, with the result that he was so injured that he died before he could be taken to a hospital.

In this court no complaint is made of the amount of the verdict. Neither is it contended that Waterbury was negligent in any respect which resulted in his death. Neither is it contended that plaintiff is not entitled to recover from some one of the appellants. The real contest in the trial court below and here is which one, or if all, of the appellants are liable.

The G. & W. Truck Lines is operating under the workmen's compensation act. After Waterbury's death his widow and child filed a claim for compensation against G. & W. under the compensation act. This claim was allowed in the sum of $4,964 and was paid by

G. & W. or its insurer. Pending this action in the trial court G. & W. and its insurer filed a motion to intervene and set up the facts and be subrogated to plaintiff in respect to any judgment plaintiff would receive in this action. That motion was denied. After judgment was rendered G. & W. and its insurer filed a claim in the district court to have the amount of it paid in a compensation proceeding out of the judgment recovered. That matter has not been passed upon and is not here for review.

In plaintiff's petition the pertinent portions of the above facts were alleged, and respecting the liability of defendants it was specifically alleged:

"At all times material hereto, the said building was directly and entirely under the management, control, and possession of each and all of the defendants, and the defendants were jointly in complete control of the warehousing operations in the said building, and the defendants had assumed the responsibility for, and were purporting to discharge the duty of, keeping and maintaining the said building in a safe condition for the protection of any and all persons lawfully in the same.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"The plaintiff does not know, and therefore does not attempt to allege, what specific acts of negligence any one of the defendants may have been guilty of and that may have been the proximate cause of the death of the plaintiff's husband, but the plaintiff states the collapse of the warehouse floor and the resultant death of the plaintiff's husband was an occurrence which would not have taken place except for some act or acts of negligence in the inspection, maintenance, operation, or repair of the said building; and the plaintiff states that the sudden collapse of the said floor and the resultant death of her said husband were the direct results of some act or acts of negligence on the part of the defendants, either jointly or severally, in the maintenance, inspection, operation, or repair of the said building."

And in response to an order made on the motion to make the petition more definite and certain an addendum to the petition was added, which alleged:

"The freight hauler by whom the plaintiff's husband was employed on the said 11th day of December, 1947, was B. F. McReynolds, whose residence and postoffice address is 538 Pattie, Wichita, Kansas, who, as this Plaintiff is informed and believes, was hauling the said beer for a freight hauler known as G & W Trucking Company, Wichita, Kansas. The Plaintiff believes and therefore alleges that neither the said B. F. McReynolds nor the G & W Trucking Company had any part in the possession, control, or operation of the said premises."

The answer of Burkhardt & Sigman contained a general denial of matters not specifically admitted; admitted the allegations in

the petition of the residence of plaintiff and the answering defendants; alleged that on December 11, 1947, they were the owners and tenants in common of the building in which plaintiff alleged her husband met his death, and further alleged that on April 26, 1947, they entered into a certain lease agreement with the defendant Rocky Mountain, which instrument was attached to and made a part of the answer as "Exhibit A," and also a certain letter, a copy of which is attached as "Exhibit B," authorizing Rocky Mountain to sublet the premises; that Rocky Mountain entered into possession of the premises described in the lease and remained in control thereof at all times material; that the answering defendants believe and therefore allege that the defendants Riss & Company and Country Club, or either of them, was in possession of the premises on December 11, 1947, subject to the lease, "Exhibit A," and pursuant to the letter, "Exhibit B." The lease agreement attached was for a term of five years. The rent was stipulated, and among other things recited:

"That said lessee shall use said leased premises for operating a truckline depot and warehouse storage business. . . .

"That said lessee shall maintain and keep said building and premises in good repair, except the walls and the roof thereof which shall be maintained by the lessor. That said lessee shall make such alterations in the leased premises as are necessary to the conduct of its business; provided, however, that said lessee shall make no structural change in said building without first obtaining the written consent of the lessor.

. . . . . . . . . . . . . . . . .

"That lessee agrees to save harmless, protect, and indemnify the lessor from and against any and all losses, damages, claims, suits or actions, judgments and costs which may arise or grow out of any injury to or death of persons, or damage to property in or about or in any way connected with the demised premises caused solely by the act of the lessee; and lessor agrees to save harmless, protect, and indemnify the lessee from and against any and all losses, damages, claims, suits or actions, judgments and costs which may arise or grow out of any injury to or death of persons, or damage to property in or about or in any way connected with the demised premises caused solely by the act of the lessor; it being understood that any and all losses, damages, claims, suits or actions, judgments and costs which may arise or grow out of any injury to or death of persons or damage to property in or about or in any way connected with the demised premises, caused by the joint or concurring acts of lessor and lessee, shall be borne by them jointly. . . .

"That lessor warrants that it is the owner of the premises hereby demised; that it has full authority to lease the same to lessee for the term herein set out.

. . . . . . . . . . . . . . .

"That said lessor, or its agent, shall have the right to enter the premises hereby leased at all reasonable times to inspect said premises."

It also contained a provision by which the lessee could not sublet the premises without the written consent of the lessor. Upon the same date, however, by letter the clause in the lease limiting the lessee's right to sublet the premises was referred to and it was said:

"We herewith consent to the sub-leasing of part of said premises for a same or similar line of business, and especially for the dry storage warehouse business, subject always to all of the terms of this lease and to the continuing obligation of the lessee to fulfill all of the obigations of this lease and without relieving it of any of such obligations."

Rocky Mountain filed an answer which was a general denial of the allegations of the petition except that it is a corporation; alleged a lease from Burkhardt & Sigman to it, and the letter from Burkhardt & Sigman to it authorizing it to sublet a part of building "J"; that about November 25, 1927, pursuant to its authority to do so, it entered into an oral agreement with Country Club for the annex to building "J" for use as a warehouse at an agreed rental of $110 per month; that the annex is completely separated from the remainder of building "J" by a brick wall extending the full height of the building; that pursuant to the oral agreement Country Club entered into the exclusive possession, management and control of the annex to building "J" and was in exclusive possession, management and control on December 11, 1947; and that if plaintiff's husband came to his death, as alleged in the petition, the said death and any and all causes contributing thereto occurred in the east annex to the building and not in any portion of the building in the possession of or under the management and control of defendant; and further alleged that the petition failed to state a cause of action against the defendant Rocky Mountain.

Country Club filed an answer in which it alleged plaintiff's petition failed to state a cause of action against it, and generally denying all the allegations contained therein. It specifically denied allegations in plaintiff's petition of the management, control and possession in each and all of the defendants, and that defendants were jointly in complete control of the warehouse operations of the building, and that defendants had assumed the responsibility of discharging the duty of keeping and maintaining the building in a safe condition; denied that the death of plaintiff's husband was the result of negligence of the defendants, either jointly or severally, in

the maintenance, inspection, operation or repair of the building; further alleged that Country Club had entered into an oral agreement with Riss & Company through its agent Barthelme, who was also the agent of Rocky Mountain, by which Country Club leased its portion of the premises for the storage of beer on a month to month basis, and that Barthelme had advised Country Club that the place where the beer was being stored at the time in question was perfectly safe to store beer to the rafters, and made no mention of any written lease, or the terms thereof; that the collapse of the floor was due to a latent defect in the building in that there existed a six-foot pit below the ground level, which was unknown to Country Club but well known to Burkhardt & Sigman, and that Country Club had no authority to inspect or make repairs on the premises, and that there was nothing about the premises which called attention to the latent defect. The answer further alleged that plaintiff could not maintain a cause of action against Country Club for the reason that G. S. 1935, 44-503 prevails; that defendant was engaged in the wholesale distribution of beer and was under obligation to provide for the hauling of the beer to its warehouse; that in carrying out this work it entered into a contract with G. & W. Truck Lines to haul the beer from the brewery to its warehouse; that Hillard Waller, one of the partners of G. & W. Truck Lines, had a dual relationship with Country Club; that he was employed as a general warehouse and office worker on a fixed salary, plus overtime; that he made the contract for the hauling and delivery of the beer to the warehouse; that he entered into an agreement with McReynolds, who was purchasing a tractor, to furnish the truck and driver to pull the trailer owned by G. & W. Truck Lines in the hauling of the beer; that McReynolds was to furnish a driver to haul the trailer, and the driver was to assist in the unloading of the trucks at the warehouse; that at the time in question plaintiff's husband, being an employee of McReynolds, was assisting in such work of carrying beer cases from the truck to the unloading dock, and also carrying such cases from the unloading dock to the place in the warehouse where it was to be stored, and that by reason thereof Waterbury came within the provisions of the workmen's compensation act as an employee of a subcontractor of Country Club.

Each of the appellants demurred to plaintiff's petition, which demurrers were overruled. The questions raised in the several answers were properly put in issue by replies. When the case was called for trial counsel for plaintiff made an opening statement.

Thereafter each of the appellants filed a motion for judgment on the pleadings and opening statement, which motions were over-ruled. The plaintiff, called as a witness, testified she was the wife of Charlie Waterbury; that she became acquainted with him in 1944, and was married on June 26, 1947; that at the time of his death on December 11, 1947, he was employed by B. F. McReynolds at a filling station at wages of $50 a week; that he was born January 20, 1908, and was in good health prior to his death; that she was entirely dependent on him for support; that he was previously married and had a daughter, Charlene, by that marriage, who lived in Great Bend; that she paid his funeral expenses amounting to about $400. On cross-examination she was asked whether her husband, prior to the time of this accident, was contributing to the support of his daughter. She testified that she was sure he did. Further inquiry into the matter was objected to by appellant and the objection was sustained. Upon a stipulation being entered into that Waterbury and his first wife were divorced in an action in the district court of Sedgwick county, in which an order was made that Waterbury should pay the sum of $7.50 per week for the support of his daughter, Charlene, to be paid to the clerk of the district court to be transmitted to Charlene, the clerk of the court's records did not show any payments made through that office.

Sam E. Rudd, called as a witness for plaintiff, testified that he was one of the defendants and one of the owners of what is known as the Burkhardt & Sigman premises; that he is the local manager for the owners in the handling of all matters pertaining to that property and has an office on the property. He described the premises, stated there are twelve buildings on the property, which are leased to nine tenants; that the leases were drawn up by a local attorney, but he is the person on the premises who negotiates them. The lease to Rocky Mountain for building "J" and the letter authorizing the lessee to sublease the property were introduced in evidence. This letter did not specify any particular subtenant. That upon the execution of the lease Rocky Mountain went into possession of the premises. Witness later learned that Country Club had gone into possession of a part of the property. He was in the building prior to Waterbury's death. The Country Club was in the annex at that time. Mr. Barthelme called his attention to the fact that part of the floor in the center of the annex was spreading. He took his maintenance man, a Mr. Ross, and went in there and looked at

the floor. After that examination he advised Mr. Barthelme, who was present, that if they would get the part of the floor load removed they would come in and repair the floor. The floor of the annex was constructed of wood. It was solid over the full 16 x 125 feet, without openings down beneath. After the accident resulting in the death of Waterbury he repaired the floor under a working agreement with Rocky Mountain with regard to repairs, and at that time replaced the entire floor with concrete. The floor of the annex was repaired but once, and that was after the accident. The witness could see for himself that the floor was sagging. When he and Ross were there they took up some of the flooring and Ross went beneath it and found some posts broken. He told Barthelme it would be too dangerous to do any work under the floor without removing the floor load. He discussed this matter with Barthelme two or three times. The witness dictated a letter to Rocky Mountain in care of Barthelme, which was offered in evidence over the objection of Rocky Mountain. The letter, written on a Burkhardt & Sigman letterhead, and dated December 5, 1947, reads:

"In connection with our various conversations relative to the floor in the Northeast part of your East Annex to your building. As the writer explained to you we will be very happy to repair that floor, that is to replace some of the posts that are now broken. This can only be done when you get the greatest part of the floor load removed. Understand that we do not guarantee any floor load. Any damage to the floor, or any part of the building, by this floor cave-in will be your responsibility. We would suggest, however, that the earliest possible time the weight can be removed from your floor you advise us so that this can be repaired; as in our opinion the load you have there now will cause some damage. Please advise us as quickly as possible when we can go in and make these repairs." The letter was signed, "Burkhardt & Sigman, Sam E. Rudd."

Counsel for plaintiff objected to the introduction of this letter upon the ground that it was not proper cross examination. Counsel for Rocky Mountain also objected to its introduction for the same reason. Counsel for Burkhardt & Sigman argued that it goes to the ultimate facts and would save time, and that the court and jury should know about it. Further cross examination brought out the fact that the break which occurred at the time of the accident was about eight or ten feet away from where he had seen the floor sagging. Mr. Ross went down beneath the floor. The witness himself could see some broken posts; he did not know how many. By posts he meant supports to the floor load from below. Mr. Ross was not under the floor very long, but he made an examina-

tion fairly enough to find out what the trouble was. The floor planks were replaced. The witness did not give any indication to Country Club as to the condition found beneath the floor for the reason, as he stated, that he had no dealings with Country Club.

Frank Barthelme, called as a witness for plaintiff, testified that from May, 1947, until the date of the accident he was employed by Rocky Mountain in the capacity of agent or manager. He was the highest official in Wichita. That since the lease was entered into he operated a truck terminal in that building under his management, which loaded and unloaded freight. He described building "J" and the annex. He recalled having a conversation with Mr. Rudd at the time his maintenance man examined the floor to the effect that if Mr. Rogers, of the Country Club, would remove the beer from that portion of the floor Burkhardt & Sigman would fix the floor. They would do this only when the load was off the floor because it would be too dangerous to go under the floor until the load was removed. After that conversation he received a letter from Burkhardt & Sigman, but did not remember what he did after receiving the letter. Before receiving it, and after he talked with Mr. Rudd and examined the premises, he talked to Mr. Rogers of Country Club and passed to him the information Rudd had given the witness to the effect that when the load was removed from the floor on the portion of the building he noticed was sagging that Burkhardt & Sigman would make the necessary repairs; that when he and Rudd examined the part of the floor on which the beer was situated the annex was about one-third full of beer, and it had about the same amount of it when he told Rogers that if he would remove the beer Burkhardt & Sigman said they would repair the floor. So far as the witness knew, Country Club did nothing with reference to that beer after he had told them. More beer was put in, so that at the time of the accident the annex was nearly full. The witness did not recall the exact date when Country Club started to store beer in the annex. He noticed the floor was beginning to sag a couple of days after they started to store the beer. His oral agreement with the Country Club was that he rent them the complete annex. No written lease was prepared at the time, but a lease was to be drawn up, and it was actually drawn quite awhile after the accident. He further testified that the doors and openings to the annex were closed, except one, which had a padlock on it; that no employee of Rocky Mountain was in the annex when the accident occurred; that he was in the annex two or three times after Country Club started to store

beer there. He heard the floor cracking a little and thought they would go in and examine it. He did not have Country Club's permission to take up some of the floor to make the examination. Mr. Rudd, his maintenance man, and the witness were present when the examination was made. No warning signs were put up and no repairs made on the floor before December 11, 1947. The witness further testified that he never directed any of the activities of the Country Club after he subrented it with reference to the unloading of beer in the annex, or doing anything else; that he did not tell Country Club where to put beer in the annex. At the time he leased the annex to Country Club Mr. Rogers told him what Country Club wanted to store. He may have told Mr. Rogers at that time that it had been used by Beechcraft, but he didn't know what they stored there. He did not tell Mr. Rogers in substance that he could pile beer in the south end up to the rafters and it would handle it. He did nothing other than talk to Rogers about moving the beer and fixing the floor.

H. R. Rogers, called as a witness for plaintiff, testified he was the manager of Country Club, which is a wholesale distributor of cereal malt beverages; that about the middle of November he had an oral conversation with Barthelme about renting the annex to building "J." Barthelme told him that the annex was for rent and that it had been occupied by Beech. Nothing was said to him as to who was to maintain or make repairs on the building. Thereafter, when the floor was sagging in the north end, Barthelme told him his landlord, or the man who looked after the property, had seen the floor was sagging and that he wanted to brace it; that he didn't want to put a man under the floor with a heavy load on it. Barthelme did not tell him to remove the load, but said if the witness's men were busy he would take his men and move the beer into the warehouse until the floor was fixed. The witness told Barthelme he did not want to put him to that trouble, that if there was no particular rush to fix the floor he would start to fill the south end and that they would be taking the beer out of the north end within the next two weeks, which would relieve the floor that much, and that Barthelme told him that if they were going to move the beer out that soon that it would not be necessary to move it. The witness told Barthelme that he was going to fill the south end, and asked about the floor to the south, and that Barthelme said he was sure that was in good condition and that he could stack it clear

to the rafters if he wanted to, and that he went and stacked beer in the south end until he had it almost full; that after the break in the floor he went to see it. The floor was twenty or twenty-four inches from the level of the ground as the witness went into the building; that where the floor fell there was a pit six to eight feet deep, about thirty feet long, the width of the building; that the floor broke in the middle and pulled the stringers out of the wall on each side; that the place where the floor broke was about in the middle; that Mr. Barthelme talked about wanting to go under the north end and brace it; that he did not say anything about putting supports under the south end; that Barthelme told him on the south end he could store to the rafters; that after the cave-in he and his foreman, Mr. Walter Binge, went to see Mr. Barthelme and asked Barthelme if he didn't tell the witness that he could go to the south end; that it was substantial and we could stack clear to the rafters if we wanted to; and he said, "that was what I said and I will stay with it." He further testified that Barthelme notified him that the floor was sagging in the north end, but that no one had told him of the examination made of the floor but Barthelme and his mainte-nance man; that at that time Barthelme called his attention to the sagging of the floor and that the entire north end of the annex had been filled with beer, about 4,000 cases. When the floor collapsed there were 8,825 cases of beer in the annex. One case weighs a fraction over 40 pounds and covers 16 x 11 inches of floor space; stacked eight cases high the floor load would be about 325 to 350 pounds per square foot. If the annex is 16 x 125 feet that would be 2,000 square feet, and at 350 pounds per square foot the total floor load would be 700,000 pounds. The openings between the annex and the main building were closed. When Barthelme offered to loan some of his men to move the beer from the north end of the annex so the floor could be repaired the witness told him:

"That was nice of him, we were busy, but that wouldn't be necessary, if they couldn't wait, we would move it. That we were going to start to using out of the north end and in the next two weeks would have at least 2,000 cases moved."

This was about a week before the cave-in, at which time no beer had been removed from the north end.

B. F. McReynolds testified that early in December, 1947, he was operating a filling station and was also engaged in the business of driving a truck; that he owned and leased to G. & W. his trac-

tor without a trailer, and at times drove the tractor-trailer for G. & W. for the purpose of hauling beer from Missouri to Wichita; that on the morning of December 11 the tractor-trailer had returned to Wichita with a load of beer consigned to Country Club; that he had two employees at his filling station, Waterbury and another; that Waterbury was on duty that morning; that he did not go with the truck to be unloaded that morning, but sent Waterbury in his place.

Hillard Waller testified that he had lived in Wichita for nine years; that he was engaged in the trucking business under the name of the G. & W. Truck Lines; that he was authorized by the Interstate Commerce Commission and the Kansas Corporation Commission to do contract hauling from Missouri to Kansas and was under a contract, among other people with Country Club, to haul beer from St. Joseph and Kansas City to Wichita and had a contract with McReynolds whereby he leased McReynolds' tractor to operate under the G. & W. carrier permits; that on the morning of December 11, 1947, McReynolds' tractor was there with a load of beer for Country Club; that the witness and Waterbury were present at the annex to building "J" and assisted in unloading it; that they were finishing loading the south aisleway and bringing the conveyor to the door when the floor caved in without warning. Waterbury was covered up by cases of beer. The witness helped get him out, but Waterbury died either on the way to the hospital or soon thereafter. The witness further testified that no employee of Rocky Mountain was present when the beer was being unloaded; that he saw the floor at the north end after it commenced to sag prior to the south end collapse; that it sagged all the way from two to five or six inches from its normal level; that Walter Binge, foreman of Country Club, was in charge of stacking the beer; that Binge told where to stack the beer; that at the time of the accident he was in the employ of G. &. W.; that under his contract with Country Club "it was our duty to haul the beer and unload it on the dock and help load it into their warehouse." The witness further testified that:

"At the time of the accident I was also in the employ of Country Club Distributing Company part time in the position of office worker and warehouse worker which was wholly separate from our contract to haul beer."

At the close of plaintiff's evidence each of the appellants here filed a demurrer to the evidence. These demurrers were overruled.

Burkhardt & Sigman called no additional witnesses. Rocky Mountain called their manager, Frank Barthelme, who had previously testified. He repeated the substance of his former testimony about the leasing of building "J" and subletting the annex to Country Club and testified that after Country Club started putting beer in the annex you could hear the floor giving a little; that he called Mr. Rudd's attention to it; that Mr. Rudd brought his maintenance man and looked at it, and that "Mr. Rudd told me that if we would take the load off the floor, he would repair it"; that he immediately contacted Mr. Rogers, the manager of Country Club, and offered to use some of his men to move the beer into the other part of the building till the floor could be fixed; that Rogers said there was not much use in doing that because in a couple of weeks he would have the beer out of the north end. He told Rogers about the examination of the floor and all he knew about the condition of the floor, and further testified:

"I never agreed with Mr. Rudd or anyone else that I or Rocky Mountain Industries would be responsible for any break in the floor. I had nothing to do with the letter addressed to Rocky Mountain Industries by Burkhardt & Sigman, B. & S.'s Exhibit 'A', and did not agree to the statement in the letter about any damage by a floor cave-in being our responsibility. . . . Mr. Rudd did not ask me or my company to repair the floor. He said he would repair it."

Martin Dondlinger, called as a witness for Rocky Mountain, testified that he had been a contractor for about twenty years; that he went into building "J" where the accident occurred on December 11; that he was familiar with the construction of the floor of the annex; that the floor boards ran north and south and that at the place where the floor gave way there were 3 x 12 joists running east and west under the floor twenty-four inches apart. He further testified:

"The maximum safe floor load for a building of that type of construction is about 125 pounds per square foot. It would carry some more than that, but that allows for the safety factor. It might carry 200 pounds to the square foot, but if you had a jar or something, you would be liable to break it. . . . This was typical warehouse construction at the time it was built but would not be typical today."

Country Club called Walter Binge as a witness. He testified that he was warehouse foreman for Country Club, had been since before November 10 and later than December 11, 1947; that during that time G. & W. delivered beer for storage in the annex to building "J"; that a part of his duties was to direct the storage of the beer

from the truck to the annex floor; that a few days after Country Club leased the annex he went there to look over the building, which at that time did not appear to have any defects in the structure of the floor, it looked substantial. "When we had beer stacked in about half of the north end, we could all see that the floor had sagged"; that on December 11, 1947, he was in charge of stacking and storing the cases of beer in the annex; that the witness Waller and Waterbury were in the building when the floor gave way without warning. Country Club also introduced in evidence a certified copy of an instrument which showed that on July 24, 1946, it had filed with the commissioner of workmen's compensation its election to come within the provisions of the workmen's compensation law.

At the close of the evidence each of the appellants here filed a motion for judgment or for an instructed verdict, which several motions were overruled. The court instructed the jury. Appellants' criticism of the instructions will be noted later. At the request of Rocky Mountain and Country Club, objected to by Burkhardt & Sigman, the court submitted special questions to the jury, which questions and answers are as follows:

"1. Q. Do you find that the defendant, Riss & Company, Inc., was guilty of any specific negligence which was the proximate cause of the death of Charlie Waterbury? A. No. . . .

"3. Q. Do you find that the defendant, Rocky Mountain Industries, Inc., was guilty of any specific negligence which was the proximate cause of the death of Charlie Waterbury? A. Yes.

"4. Q. If your answer to the foregoing question is in the affirmative, state what such negligence consisted of? A. Failed to have building condemned and insist on building being put into safe condition.

"5. Q. Do you find that the defendant, Country Club Distributing Co., Inc., was guilty of any specific negligence which was the proximate cause of the death of Charlie Waterbury? A. Yes.

"6. Q. If your answer to the foregoing question is in the affirmative, state what such negligence consisted of? A. Failure to have building condemned and put in safe condition. Also continuing to add load to the floor.

"7. Q. Do you find that the defendants, Burkhardt, Morris Sigman, Sam Sigman, Sam E. Rudd, Elenore Rudd, Leonard A. Levand and Celia Levand, were guilty of any specific negligence which was the proximate cause of the death of Charlie Waterbury? A. Yes. Failure to have building condemned and put in a safe condition."

As previously stated, the general verdict was in favor of the plaintiff in the sum of $12,000 against the defendants, Burkhardt & Sigman, Rocky Mountain and Country Club. Each of the appellants filed post-trial motions, including a motion for a new trial,

all of which were considered by the court and overruled, and the defendants have appealed separately.

Each of them filed an abstract setting out that portion of the record which its counsel deemed appropriate to its appeal. This has resulted in some overlapping and perhaps in some omissions of pertinent portions of the record. Counsel for appellee in their brief state that for that reason they are not filing a counter abstract but will refer in their brief to a few portions of the record omitted from any of the abstracts filed by appellants. We shall endeavor to note those we deem pertinent.

We now turn to the consideration of the legal questions argued.

The respective counsel for appellants complain of the rulings of the trial court upon various demurrers and motions. We have examined each of these and find nothing seriously wrong with the rulings of the court, certainly nothing that would justify a reversal. It would serve no useful purpose to set these out in detail and discuss and rule upon them.

Counsel also argue that the case was predicated upon the doctrine of *res ipsa loquitur*, that the evidence showed specific negligence, and that the answers to special questions, the verdict and judgment were predicated upon specific negligence. Assuming this argument to be well taken, and that someone is to blame for it, the record discloses appellants did much more to bring that situation about than did the appellee. The allegations of the petition and the testimony of plaintiff disclose that Waterbury's death arose from an accident for which any or all of three or four parties were to blame. With the parties contending between each other as to which was to blame it would have been difficult if not impossible for plaintiff or her counsel before filing the petition to have made an inquiry and to have found the specific acts and claims of the respective defendants. For that reason it was not improper to predicate the action upon the doctrine of *res ipsa loquitur*. Each of the defendants filed answers, each denying liability and alleging facts designed to relieve that party of liability and place the blame upon one of the others. When the trial started plaintiff was called to the stand and testified to the facts indicating that some one or more of the defendants was liable. This is not now controverted by anyone. Plaintiff then called the manager of each of the appellants and examined him primarily with respect to the relation of that defendant to the business and its control thereof. Counsel for the respective defendants on

the cross-examination of that witness went further than the direct examination to bring out additional facts. Counsel for plaintiff objected to that as not being proper cross examination. The court permitted counsel for defendant to go forward with the examination and bring out such facts as he desired from the witness. Some of the matters so called out from further examination by plaintiff or counsel for one of the other parties brought out additional facts tending to show or bearing upon specific negligence. This process continued as to each of the appellants.

In this connection we had as well deal with the special questions. Counsel for plaintiff did not ask for special questions. Counsel for Rocky Mountain and for Country Club did ask for special questions. Counsel for Burkhardt & Sigman objected to the giving of special questions. We call attention to the fact that the special questions relate only as to whether each of the respective defendants was guilty of any specific negligence which was the proximate cause of Waterbury's death. That was the real controversy as between the respective defendants. We think it was appropriate for the court to submit the questions. Indeed, the parties who desired them were entitled under the statute to have them given. (G. S. 1935, 60-2918.) It will be noted that as to three of the defendants there were two questions: *First*, was the party guilty of negligence? *Second*, if the answer was in the affirmative for the jury to state what such negligence consisted of. Since the jury did not find Riss & Company guilty of such negligence, it did not answer the second question as to it. As to the defendants Rocky Mountain and Country Club, the first of the two questions was answered in the affirmative and the second was answered. With respect to the defendant Burkhardt & Sigman, only the first of the two questions was asked. The jury answered that "Yes" and went on to state what the negligence consisted of. Their counsel here complain of the latter portion of that answer and contend there was no evidence to support it. In fact, all of the answer to the question submitted to the jury in addition to the word "Yes" was surplusage. It should have been stricken and no doubt would have been had anyone requested it. It need not be considered. (See *Hall v. Kansas City*, 112 Kan. 752, 212 Pac. 875, 30 A. L. R. 782.)

The doctrine of *res ipsa loquitur* is not one of substantive law, but is one pertaining to evidence. Where it is relied upon alone it simply means that certain facts and circumstances raise an in-

ference or presumption of liability. Generally speaking the rule is that when specific acts of negligence are brought into the case by the evidence the doctrine of *res ipsa loquitur* loses its force and the case must be determined upon the facts showing specific negligence. (See *Daniel v. Otis Elevator Co.*, 154 Kan. 293, 118 P. 2d 596.) We are cited to no authority and our research has disclosed none holding that when *res ipsa loquitur* is pleaded and relied upon by plaintiff and at the trial defendants' evidence discloses specific acts of negligence of defendants which justify judgment for plaintiff, that plaintiff is thereby defeated in his action.

In this court counsel for Country Club, aside from rulings upon motions and demurrers already disposed of, present but one question for our determination. They contend that Country Club is liable to plaintiff, if at all, only under the subcontractor section of our workmen's compensation law (G. S. 1935, 44-503). Their argument runs like this: Country Club is a licensed distributor of cereal malt beverages; it cannot distribute the beverages unless it can have the beverages transferred from where they are made to its warehouse in Wichita; that it made a contract with G. & W. to transfer the malt beverages from Missouri to Wichita; that Waterbury was an employee of G. & W., and that Waterbury's death by accident while so employed is one for which Country Club, as the principal contractor, is liable; it is pointed out that when the workmen's compensation law is applicable it constitutes the sole remedy of the workman or his dependents, hence that plaintiff could not maintain a common-law action against Country Club for damages. The argument lacks merit. Country Club, as a distributor of malt beverages, is licensed by the director of revenue of the state commission of revenue and taxation and its business is conducted under the authority of our statute (G. S. 1947 Supp. 21-2701 *et seq.* and 79-3817 *et seq.*). G. & W. is not licensed as a distributor of malt beverages and is not employed by Country Club to do that type of work by any type of contract. G. & W. is licensed as a contract carrier under our statute pertaining to the regulation of motor carriers of persons and property (G. S. 1935, 66-1,102 *et seq.*, and specifically 66-1,112a) issued by the state corporation commission. It is not licensed as a distributor of malt beverages. Neither Country Club nor G. & W. is authorized under its license to conduct the business of the other. Waterbury was a temporary or substitute employee of G. & W., which was operating under the workmen's compensa-

tion act, and its beneficiaries were entitled to recover under that act from G. & W. or its insurance carrier, and did so. This fact did not prevent his dependents from suing Country Club in a common-law action for damages. (See, G. S. 1947 Supp. 44-504; *Davison v. Eby Construction Co.,* 169 Kan. 256, 218 P. 2d 219.

In their brief counsel for Country Club make no contention that Country Club was not guilty of specific acts of negligence which contributed to the death of Waterbury, as the jury found. Therefore judgment was properly rendered against Country Club.

Counsel for Burkhardt & Sigman, in addition to discussing the rulings of the court on certain motions and demurrers hereinbefore disposed of, relied primarily upon their lease with Rocky Mountain, pertinent portions of which have been set out herein, and upon the general law of landlord and tenant. They point to the covenant in the lease,

"That said lessee shall maintain and keep said building and premises in good repair, except the walls and roof thereof which shall be maintained by the lessor. That said lessee shall make such alterations in the leased premises as are necessary to the conduct of its business; provided, however, that said lessee shall make no structural change in said building without first obtaining the written consent of the lessor."

And also point to the provision:

"That said lessor, or its agent, shall have the right to enter the premises hereby leased at all reasonable times to inspect said premises."

They argue that since Waterbury's death did not result from any collapse of the walls or roof they are not liable. This overlooks the provision of the lease "That said lessee shall use said leased premises for operating a truckline depot and warehouse storage business," which amounted to a representation that the building was suitably constructed for that purpose. It also overlooks the provision in the lease indicating the parties contemplated injuries to or death of persons might result under circumstances for which the lessor and the lessee would be jointly liable. Nothing was said in the lease about a floor load. Nothing was said concerning that matter until in the letter of December 5, 1947, of Burkhardt & Sigman to Rocky Mountain written by Rudd after he knew the floor was sagging and at a time when he realized that the load on the floor at that time would cause damage. Notwithstanding the interpretation which should be given to the lease with respect to the lessee making repairs, as to whether that applied to the floor, the

evidence clearly discloses that a few days before the letter of December 5 was written Rudd, the manager of Burkhardt & Sigman, was advised that the floor was sagging; that Rudd took his maintenance man Ross there to examine it, and that he then said that he would repair the floor if the load was removed so that men could work at it safely. He did not ask Rocky Mountain's manager, Bathelme, who was present, to repair the floor, but said he would repair it. We think these facts tend rather clearly to show that Burkhardt & Sigman did not understand the wording of the lease to require Rocky Mountain to repair what was obviously a serious weakness of the floor, which Rudd knew was then overloaded. There was also evidence that the structure of the floor would not hold safely a weight of more than 125 pounds to the square foot. The load then on the north end of the floor was something over twice that. Burkhardt & Sigman had rebuilt the north, east and south walls of the annex, probably constructed the floor, and knew it was from two to four feet above the ground and that it was supported with posts underneath, which posts had rotted or broken. The American Law Institute, in its Restatement of Torts, § 357, lays down what appears to be the applicable rule as follows:

"A lessor of land is subject to liability for bodily harm caused to his lessee and others upon the land with the consent of the lessee or his sub-lessee by a condition of disrepair existing before or arising after the lessee has taken possession, if

"(a) the lessor, as such, has agreed by a covenant in the lease *or otherwise*, to keep the land in repair, and

"(b) the disrepair creates an unreasonable risk to persons upon the land which the performance of the lessor's agreement would have prevented." (Our emphasis.)

This rule supports the trial court in submitting to the jury the question of the specific negligence of Burkhardt & Sigman, and also of Rocky Mountain.

Counsel for Rocky Mountain argue that as the lessee of Burkhardt & Sigman and as the lessor of Country Club it was the duty of the ultimate tenant, Country Club, to keep the premises in good repair. In the situation shown by the evidence in this case we think the point is not well taken. We have none of the terms of the lease to Country Club except that it was leased by Rocky Mountain to Country Club under an oral agreement from month to month that Country Club should use the place for the storage of beer. This necessarily carried with it the representation that the building was

suitable for that purpose. There was a controversy between Rocky Mountain and Country Club as to whether there was any representation as to the quantity of beer which Country Club might store in the building. Apparently the jury resolved that in favor of Rocky Mountain, which evidence was to the effect that no specific representation was made by Rocky Mountain as to the amount of beer which Country Club might store there. The fact, however, remains that when Rocky Mountain's manager discovered soon after Country Club commenced using it that the floor was sagging, and later learned that the quantity of beer stored there was likely to cause damage to the building, and perhaps to those rightfully in there, Rocky Mountain did nothing effective to prevent the breaking of the floor, with the resulting death of Waterbury. We think the question of Rocky Mountain's negligence in that respect was a proper one to submit to the jury and that the finding of the jury with respect thereto was supported by substantial, competent evidence.

Both Burkhardt & Sigman and Rocky Mountain argue that there was an intervening cause, namely the negligence of Country Club in continuing to pile great quantities of beer in the building when it was known the floor was so defective that it was likely to cause damage. It can hardly be said, however, that they did not also know those facts. Neither is it correct to say, as their counsel argue, that they had no way to stop it, since Country Club was the tenant actually and primarily in possession of the building. This does not follow. In the lease from Burkhardt & Sigman to Rocky Mountain the lessor specifically retained the right to inspect the premises. Obviously, under the terms of the oral agreement with Rocky Mountain and Country Club the manager of Rocky Mountain had the right to inspect the property. At any rate he did so. He found the floor sagging, thought it dangerous, sent for the manager of Burkhardt & Sigman, they examined it, and both of them thought it dangerous. Rocky Mountain's manager offered to remove some of the beer so that repairs could be made and communicated that fact to the manager of Burkhardt & Sigman. They both yielded to the suggestion of the manager of Country Club to delay their repairs for perhaps two weeks until Country Club would remove some of its beer in the normal course of its business. Whether that conduct was negligent which, combined with the negligence of Country Club in continuing to put much greater weight upon the floor, resulting in the floor giving way and in Waterbury's death, we think was a

proper question to submit to the jury. Both of these appellants argue that the annex was not a building open to the public, hence that they were not liable to some member of the public who went into the building. We see no room in this record for the consideration of that point. Waterbury was not there as a member of the public. He was there in the capacity of an employee of G. & W., who were rightfully in the building to perform a part of their duties.

At the trial counsel for Rocky Mountain objected to several of the instructions, but they discuss none of them here and we presume the objections to them have been abandoned. Counsel for Burkhardt & Sigman at the trial objected to one of the instructions and bring only that one here. Ordinarily when a number of instructions are given and only one of them is brought to the court we regard the record insufficient for its examination. Passing that, however, we have read the instruction and see nothing seriously wrong with it.

This record is peculiar in that four defendants were contesting among themselves as to which of them were liable to plaintiff in a case in which it was not contended by any of them that plaintiff was not entitled to recover from some of the defendants. We think the record shows that each of the defendants had full opportunity to introduce all the evidence it cared to introduce, that the evidence as a whole presented a situation quite clearly to the jury and the trial court, and that there is no material error in any of the rulings of the trial court.

The result is the judgment of the trial court must be affirmed. It is so ordered.

PARKER, J. (dissenting in part): Time will not permit detailed reference to the record or a prolonged discussion of the authorities, hence my views will be briefly stated.

I believe that under the rule laid down in *Bailey v. Kelly,* 93 Kan. 723, 145 Pac. 556, which has never been repudiated and is still the law of this state, there is nothing in the instant record to warrant the conclusion reached in the majority opinion that the owners of the property involved, who operated under the partnership name of Burkhardt and Sigman, were guilty of negligence and hence liable for the unfortunate accident resulting in the death of Waterbury. However, this dissent need not be predicated upon that premise.

The undisputed evidence is that when Rudd, the agent of Burkhardt and Sigman, was informed that part of the floor near the center of the Annex was sagging he made an inspection, accompanied

by Barthelme, the agent for Rocky Mountain, and at that time advised Barthelme the owners would repair the floor if they (Rocky Mountain and Country Club) would take the load off the floor so that it could be done. At that time there were 4,000 cases of beer stored in the Annex. Barthelme immediately contacted Rogers, the manager of Country Club, and offered to help in removing the load from the floor. Rogers said there was not much use in doing it immediately because in a couple of weeks he would have the beer out of the Annex anyway. Thereafter, instead of removing what was there, Rogers continued to put more beer in the Annex and on the date Waterbury suffered the injuries resulting in his death there were 8,825 cases there instead of 4,000. There is some evidence to the effect that Rocky Mountain consented to the additional storing but nowhere in the record is there any evidence disclosing that Burkhardt and Sigman had any knowledge of the fact, or any reason to anticipate, that instead of removing the load from the floor to permit the making of repairs Country Club was proceeding to more than double the load which was there at the time Rudd made the inspection. The accident resulting in Waterbury's fatal injuries occurred at or about the center part of the Annex. Rudd's offer to repair the floor was wholly gratuitous. Under the terms of the lease, as quoted in the majority opinion, Burkhardt and Sigman were under no obligation to repair the floor. That obligation was the lessee's who had also contracted to make such repairs and alterations in the leased premises as were necessary to the conducting of a warehouse storage business.

Under the aforesaid facts and circumstances, and others more fully set forth in the opinion, it is crystal clear that the proximate cause of the accident was the deliberate act of Country Club in continuing to store additional beer in the Annex and overload the floor, with full notice and knowledge of its condition, and that that and that alone was responsible for the accident. This, in my opinion, particularly with a record devoid of evidence that Country Club's action in that respect was taken with the knowledge, acquiescence, or consent of Burkhardt and Sigman, was sufficient, in and of itself, to acquit them of any and all actionable negligence even though it be assumed—an assumption to which I do not agree— that the evidence relating to their legal duty prior to that time was of such character as to make them liable or responsible for injuries suffered by invitees of their tenants as a result of any defective condition in the floor of the building.

I am convinced that the foregoing conclusion is not only supported but compelled by the great weight of authority (see 32 Am. Jur. 537, § 669 and American Digest System "Landlord & Tenant" § 167[7]) as well as by our own decisions if they are to be followed and adhered to.

In *Kallenbach v. Manne,* 138 Kan. 797, 28 P. 2d 746, we held:

"Where cellar doors over which customers entering a store are compelled to walk are in a safe condition in themselves and only become dangerous when one of them is left open by some third person, the fact that the cellar doors were left open does not render the landlord liable in damages to one lawfully on the premises who falls into the open cellarway and is injured." (Syl.)

And in the opinion said:

"It will be seen that the weight of authority is that where the premises are in a reasonably safe condition and only become dangerous when some agency outside the control of the landlord has intervened, the landlord is not liable for the injuries sustained by an invitee of the lessee who is lawfully on the premises." (p. 799.)

To the same effect is *Campbell v. Weathers,* 153 Kan. 316, 111 P. 2d 72, where we held:

"The mere consent of a landlord to permit his tenant to do a lawful act upon leased premises is not consent to do the act negligently or unlawfully.

"Ordinarily a landlord is not liable in damages to an invitee of the tenant where a negligent intervening act, or acts, of the tenant, over which the landlord has no control, constitute the legal, or proximate cause of the injury." (Syl. ¶¶ 6, 7.)

And at page 328 of the opinion said:

"Furthermore, according to the weight of authority, which we regard as sound, a landlord is not liable where, as in the instant case, an intervening act or acts of the tenant over which the landlord had no control constitute the procuring cause of the injury. . . ."

See, also, *Greiving v. LaPlante,* 156 Kan. 196, 131 P. 2d 898.

In my opinion the trial court erred in overruling the demurrer of Burkhardt and Sigman to the evidence, also their motion for an instructed verdict. Therefore I would reverse the judgment against all members of the partnership doing business under the name of Burkhardt and Sigman and direct the trial court to render judgment in their favor.

THIELE and PRICE, JJ., concur in this dissent.