No. 42,936

CAGLE LIMESTONE COMPANY, *Appellant,* v. THE KANSAS POWER AND LIGHT COMPANY, *Appellee.*

(376 P. 2d 809)

Opinion filed December 8, 1962.

*Frank C. Sabatini,* of Topeka, argued the cause, and *O. B. Eidson, Philip H. Lewis, James W. Porter, Charles S. Fisher, Jr., E. Gene McKinney, William G. Haynes,* and *Roscoe E. Long,* all of Topeka, were with him on the briefs for the appellant.

*O. R. Stites, Jr.,* of Topeka, argued the cause, and *Harry W. Colmery, Robert E. Russell, Lawrence D. Munns, Howard H. Becker, Martin F. Trued,* and *Floyd F. Shields,* all of Topeka, were with him on the briefs for the appellee.

The opinion of the court was delivered by

ROBB, J.: This is an appeal by plaintiff below from the judgment and orders of the trial court entered on October 25, 1961, sustaining defendant's demurrer to count one of plaintiff's first amended petition (hereafter referred to as the petition), refusing to give plaintiff's requested instructions, giving improper instructions, permitting defendant to amend its answer, entering judgment in favor of defendant, approving answers to special questions, and overruling plaintiff's post-trial motions (1) to vacate and for new trial (2) for directed verdict and (3) for judgment notwithstanding the verdict.

Appellant operated an unloading site for bulk dry cement near Bonner Springs, Kansas. The cement was shipped to appellant by railway, transferred to trucks by appellant and then transported to five missile sites located in the eastern area of the state. An electrically driven auger was used by appellant to transfer the cement from the railway cars into trucks for transportation to the missile sites. The Morris Electric Company had been hired by appellant to install electric switches and a motor to operate the auger and this had been properly done by its workmen. Appellant's operation, which started on November 2, 1959, was on the south side of highway 32 and the Lone Star Cement Plant was located on the north side of that highway.

Appellee had brought electricity into appellant's site of operations by means of three high voltage lines carrying 12,540 volts each and had installed a tall pole with two sets of crossarms thereon. These three high voltage wires and three lightning arrestors were connected to the top set of crossarms. Appellee had connected two transformers on the lower set of crossarms for the purpose of reducing the 12,540 voltage to 220 volts, which was the amount necessary to carry on appellant's operations.

The installation on the tall pole (hereafter referred to as the transformer pole) was grounded "onto a driven ground" into the earth at the bottom of the pole with No. 2 bare copper wire. From the transformer pole the voltage was carried through four wires to a shorter pole, also installed by appellee, and thence down that pole to appellee's meter and from the meter into a large steel cabinet wherein were located a sixty amp (meaning ampere) disconnect, a motor starter, a forty amp disconnect, a light receptacle, and a tele-

phone. The forty amp disconnect furnished power to the lights at the top of the shorter pole, which will hereafter be referred to as the meter pole. The sixty amp disconnect went to the motor starter. The motor starter was the overload protection for appellant's motor in that it would cut off electricity if for some reason the motor did not properly respond. The ten horsepower motor and the auger were located some thirty feet south of the meter pole. The transformer pole and the wires that crossed highway 32 from the Lone Star Cement Plant, together with the meter pole and the meter thereon all were the property of appellee and were under its exclusive control. Appellee had a substation approximately one-half mile distant through which electricity was furnished to appellant, the Lone Star Cement Plant, and the city of Edwardsville.

Appellant continued to operate its equipment until November 12, 1959. At approximately 6:00 a. m. on that day appellant's employee, Robert Stoneking, started the auger and after it had run for fifteen or twenty minutes Stoneking, who was on top of one of the railroad boxcars "spudding" the cement down into the middle of the boxcar, heard a lot of cracking noise and a pop and received a shock like one would receive from a spark plug or electric fence. He was wearing leather-soled shoes. He saw a ball of fire on the transformer which was just "plumb red" at the time and it "come over those wires to the motor" which was also a ball of fire for a little while and then it "went back to the switch box and it just exploded," and went back to the transformers and through the wires across the highway. He noticed a wire on the transformer pole leading to a lightning "resistor" was loose. By placing a circle on an exhibit he designated that this was the east lightning arrestor on the top cross-arms of the transformer pole. He saw one of appellee's servicemen climb the pole and attach "that wire back intact." Appellee's servicemen then went to its substation. He recalled there had been a morning dew but "the sun come out, it was gone."

A hole was burned through the steel cabinet which housed the motor starter switch, the two disconnnects, the light plug and the telephone. By stipulation of the parties a climatologist's report from the Topeka Weather Bureau was admitted into evidence which showed there were no thunder storms or lightning on the day in question.

Temporary lighting was made available at appellant's site in a very short time but appellant's motor was not operative until after it had been repaired.

Mr. Cagle, president of the appellant company, testified he went to appellee's office where he was allowed to examine a document in the form of "a yellow type of a report" from appellee's repairman and in answer to the question as to the contents thereof Cagle stated:

"Well, it stated a *clamp had been left loose* and that some member had fallen across another member causing a *voltage surge.*" (Our emphasis.)

Mr. William R. Wilson, an experienced electrician who inspected the motor after the burn out, testified the motor was new and would stand 1880 volts which "would be the breakdown test." Mr. Wilson and James D. Morris of the Morris Electric Company both testified more particularly on appellant's entire electrical installation, on the type of motor involved, and the motor starter which was capable of handling 575 volts and while we think it is unnecessary to detail their entire testimony, attention should be called to certain portions thereof including the following testimony of Mr. Wilson as to definition of the terms *voltage* and *current*:

"Voltage is pressure and current is the quantity, just like the small mountain stream traveling fast would be high voltage and low current, the Missouri River would be high current and low voltage because it's moving slowly, large quantity."

Further, the testimony of Mr. Wilson, as set out by the parties in the record, established that a broken ground wire coming into contact with the secondary (that part of the installation after it left the transformers) would be necessary to get a high enough voltage to do the damage here involved. He also stated that if the voltage in the primary line (that part of the installation between the source of the electricity and the point where it entered the transformers) came into contact with the secondary line, the voltage would not always have to go through the transformers because the high voltage lines could fall on the secondary line after it left the transformers.

At the end of appellant's evidence appellee demurred to count one of the petition on the grounds appellant had failed to show that the instrumentality or the cause of the damage was in the sole and exclusive control of appellee, and further, that appellant had failed to show appellee was supplying current to appellant's unloading site or that that current caused damage to appellant's

property. The above demurrer was later enlarged to include the following:

". . . that is the loose wire, several of his witnesses have testified to a loose wire; and we feel, Your Honor, that having introduced that evidence, that takes this case out of the application of the doctrine of *res ipsa loquitur* and that the demurrer to the first count of plaintiff's petition should be sustained, that there should not be an Instruction on that doctrine."

The trial court took the demurrer to the first count of the petition under advisement at that time.

Appellee demurred to appellant's evidence on count two for the reason that it failed to show any actionable negligence on the part of appellee, and the court thereupon overruled that phase of the demurrer.

Joseph N. Hogan, Jr., line foreman for appellee, was on the scene of the accident at approximately 7:45 to 7:50 a. m. He examined the transformer bank and found there were no visible signs of damage thereto. A riser leading from the secondary side to the transformers was burned off and the ground lead to the middle lightning arrestor on the transformer pole was loose. He testified that the lightning arrestors on the transformer pole had a ground wire which ran from the top crossarms of the pole on which they were mounted to each individual lightning arrestor and then down the pole to an eight foot driven ground rod.

At appellee's substation Hogan found an open reclosure which had cut off electricity to appellant, the Lone Star Cement Plant, and the city of Edwardsville. He had noticed a heavy mist at the time but he did not notice any lightning. He stated it was an undetermined thing that caused the substation reclosure to open. It was possible this fault had caused it, or anything might have caused it. He said the ground wire that had fallen loose from the lightning arrestor touching or hitting the riser could have caused the reclosure to open and he indicated on an exhibit that he was referring to the middle lightning arrestor on the transformer pole. In order to make the repairs, he spliced in a short piece of wire. He hooked the wire back to the lightning arrestor, repaired the riser, and by use of a split bolt, or connector, spliced them together. A short section of the ground wire was replaced. The loose ground wire coming into contact with the riser wire would definitely have caused the reclosure to open.

The next witness, William P. Smith, was a professor in the Uni-

versity of Kansas Engineering School. He was asked a hypothetical question wherein it was assumed there was a broken ground lead on one of the lightning arrestors, a broken phase jumper showing evidence of having been burned, an open reclosure, along with such damages as were discovered to appellant's installation, and whether under these circumstances high voltage could have been transmitted from the primary side to the secondary side so as to burn appellant's motor and motor starter. To this question Mr. Smith stated he did not think the 12,000 volts were responsible for the damage. In presenting the hypothetical question no reference was made as to Mr. Hogan's testimony in regard to the repairs he and his fellow employees were required to make to the damage on the transformer pole. Both parties set out one answer of Mr. Smith as follows as to what could have been responsible for the damage:

"Well, first of all let me state the facts as stated are a little difficult to reconcile. They don't fit into a very common pattern. I believe that the sequence of events which happened was something like this: *There certainly seems to be no question that there was a fault, and by this we mean that the two jumper wires, the first wire and this lightning arrestor jumper wire came either in contact or very close together. This would account for the burn.* This would be a single, what we call a single phase to ground fault, or a line to ground fault. This would account for the circuit breaker, the reclosure, whatever you want to call it that opened up at the substation. So then we are faced with the loss of a ground on the 12,000 volt line, that is the line running from the transformer, the Cagle transformer back to the line supplying it, and this would unbalance this line, that is also because we have the one line open due to the circuit breaker. And this *unbalanced,* plus the lack of a ground, would give some—what we call—capacitance, this is an electric circuit terminology, and the combination of this capacitance with the induction of the motor would quite possibly give rise to a rather peculiar set of conditions that we know very little about. The name for this is ferroresonance, which means iron resonance. I said we know very little about this, this is a comparatively rare thing but it does happen, however, and it gives rise to some very peculiar phenomena. You see the difficult thing to explain is why that starter motor—I am sorry—the motor starter and the motor were both burned out and gave evidence—at least the starter did—of being quite badly burned, and still the transformers and the main fuse showed apparently no evidence of damage at all. And about the only way that I can account for all of these facts is this resonance effect which means you have a circulating current in the motor and the motor starter winding which would be excited by the, in effect the capacitance of this transmission line and this could explain the damage, and this is the only way that I can put all of these facts together and explain what happened." (Our italics.)

On cross-examination Mr. Smith testified as to the element of two wires coming close to, or in contact with, each other. He said he

would require only that the wires come sufficiently close. The existence of a fault current, in the absence of lightning, was caused either by the two "jumper" wires located on the transformer pole coming in contact, or coming sufficiently close to each other, to transmit current. He stated that the two wires coming in contact, or being so close together could have been guarded against by the design or layout of the wires. In a normal installation the wires would not be together, there is always this looping effect, and the wires should have a distance of separation. However, he did not know the distance of separation at the time of the accident.

At that stage of the proceedings the trial court sustained appellee's demurrer to count one of appellant's petition and in so ruling made a lengthy statement which concluded with this sentence:

"I don't believe this is the kind of case in which the defendant had such control that he should have to explain the casualty or lose the suit."

The above is the first ruling complained of by appellant on appeal. Whether the trial court assigned the proper reason for its order sustaining the demurrer is not material if its order achieved the proper legal result. We think the result was correct for the reason that appellant alleges in count two specific acts of negligence, which it could do under our recent case of *Voss v. Bridwell*, 188 Kan. 643, 364 P. 2d 955, where it was said:

"Thus, in the instant case if the plaintiff has properly alleged a cause of action in each of the alternative counts, he may attempt to prove specific acts of negligence on the part of the defendants and still rely on *res ipsa loquitur*, subject to the qualification that if his evidence goes so far as to fully explain the cause or causes of his injury, he loses the right to rely on *res ipsa loquitur*, but an unsuccessful attempt to prove specific acts of negligence on the part of the defendants would not deprive the plaintiff of such right." (p. 651.)

We believe appellant proved specific negligence on the part of appellee through the testimony of its line foreman Hogan who stated that a riser leading from the secondary side to the transformers was burned off and a ground lead to the middle lightning arrestor on the top crossarms of the transformer pole was loose. He had found the wire loose at the lightning arrestor on the transformer pole and had spliced it with a short piece of wire. He hooked the wire back to the lightning arrestor, repaired the riser, and by use of a split bolt, or a connector, spliced them together. He did not need to replace the riser. He just had to replace a short section of the ground wire. This fault could definitely have caused the substation reclosure to open.

The above fault testified to by Mr. Hogan was further proved by the testimony of Mr. Smith who stated that when the ground wire from the arrestor and the "pumper" (riser) wire came into contact, or sufficiently close to transmit current, the whole sequence of events which took place could have been caused by such contact, or closeness. In a normal installation wires would not be together, or so close, as to transmit current. Such a situation could be guarded against by the design or layout of the wires.

While it is true that Mr. Smith answered the hypothetical question to the effect that he did not think the 12,000 volts were responsible for the damage, the hypothetical question, as heretofore stated, omitted the proved testimony of Hogan which established the circumstances in regard to the necessity for replacing a section of the ground wire on the lightning arrestor and the repair of the riser, and for this reason Smith's answer to the hypothetical question cannot be given sufficient weight to override his more particular answers in his later testimony, as hereinbefore set out. The result of Hogan's testimony showed that it was necessary for the ground wire to have a section spliced into it and that the riser had to be repaired in order for it to be a properly functioning installation. This ties in with the testimony, also set out above, regarding Mr. Cagle's visit to appellee's office where appellee's records showed that a *clamp had been left loose* and that some member had fallen across another member causing a *voltage surge.*

Nothing in the record offsets this evidence with regard to the information Mr. Cagle found in the report in appellee's office.

Under the facts and circumstances in this case and the proof of specific acts of negligence evidenced thereby we are unable to say the trial court erred in sustaining the demurrer to count one of appellant's petition. In connection therewith see *Waterbury v. Riss & Company,* 169 Kan. 271, 219 P. 2d 673; *Lamb v. Hartford Accident & Indemnity Co.,* 180 Kan. 157, 300 P. 2d 387; *Wehkamp v. City of Garden City,* 187 Kan. 310, 314, 356 P. 2d 826.

The trial court in again overruling the demurrer to the evidence as to count two on the specific acts of negligence stated:

"I believe there is sufficient evidence in plaintiff's case as to specific acts of negligence for the jury to find for the plaintiff if it believes this evidence and believes it to have been the proximate cause of the burn-out."

Thereupon appellee moved to amend its answer in the following particular:

"Further answering, the defendant alleges that if in fact plaintiff suffered

injury and damage as alleged in plaintiff's First Amended Petition which is specifically denied, the same is caused by actions over which the defendant had no control."

Appellant submitted requested instructions which were set out in the record along with all the pertinent instructions given by the trial court. We are unable to say the requested instructions of appellant were erroneously refused by the trial court for the reason they could not be given because of the trial court's ruling on *res ipsa loquitur*, or were, in substance, included in the trial court's instructions with the exception of the court's instruction No. 4½ as follows:

"You are instructed that accidents occur for which neither of the parties to the action are responsible, and if you find in this case that neither the plaintiff nor the defendant were negligent, then and in that event, your verdict should be for the defendant."

The trial court gave the above instruction as a result of appellee's amendment to its answer above set out. This particular instruction is commonly referred to as an "unavoidable accident" instruction and was objected to by appellant. Our attention is directed to the jury's answers to special questions submitted to it by the trial court as follows:

"1. Q. Do you find defendant Power Company guilty of any negligence which was the proximate cause of the burn-out? A. No.

"2. Q. If you answer question No. 1 in the affirmative, state what that negligence was. A. (Not answered.)

"3. Q. Do you find from the evidence that plaintiff was guilty of any negligence which contributed to the burn-out? A. No.

"4. Q. If you answer question No. 3 in the affirmative, state what that negligence consisted of. A. (Not answered.)"

From the arguments of the parties in their briefs, it is apparent the instruction on unavoidable accident was a factor in the jury arriving at a verdict and in its answers to special questions and this gives rise to the question as to whether the trial court erred, as a matter of law, in giving the instruction. In view of the above narrated evidence which established specific acts of negligence on the part of appellee, the instruction on unavoidable accident was improper and prejudicial under *Paph v. Tri-State Hotel Co.*, 188 Kan. 76, 360 P. 2d 1055. In that case recovery of damages for personal injuries was sought by plaintiff resulting from a fall in a coffee shop. Previous decisions of this court based on the "unavoidable accident" theory were therein so thoroughly discussed they need not be reiterated here. We there held the trial court erred in submitting to

the jury an instruction on unavoidable accident over plaintiff's objection and also erred in overruling a motion for new trial. The reasons given were as follows:

"Generally speaking, as applied to negligence cases, the term 'unavoidable accident' excludes and repels the idea of negligence, and refers to one which is not occasioned in any degree, either directly or remotely, by the want of such care or prudence as the law holds every person bound to exercise—that is, an occurrence which is not contributed to by the negligent act or omission of either party. In one sense, the term is synonymous with 'mere accident' or 'pure accident,' which imply that the accident was caused by some unforeseen and unavoidable event over which neither party had control. (Following *Knox v. Barnard*, 181 Kan. 943, 317 P. 2d 452; *Schmid v. Eslick*, 181 Kan. 997, 317 P. 2d 459; *Carlburg v. Wesley Hospital & Nurse Training School*, 182 Kan. 634, 323 P. 2d 638; *Kreh v. Trinkle*, 185 Kan. 329, 343 P. 2d 213.)

"Generally speaking, when an accident is caused by negligence there is no room for application of the doctrine of 'unavoidable accident,' even though the accident may have been 'inevitable' or 'unavoidable' at the time of its occurrence, and one is not entitled to the protection of the doctrine if his negligence has created, brought about, or failed to remedy a dangerous condition resulting in a situation where the accident is thus 'inevitable' or 'unavoidable' at the time of its occurrence. In other words, a person is liable for the combined consequences of an 'inevitable' or 'unavoidable' accident and his own negligence. (Following decisions cited in paragraph 1 of the preceding syllabus.)" (Syl. ¶¶ 1, 2.)

In view of our above conclusion it is unnecessary to cover other questions raised by the parties. The judgment of the trial court is reversed and the cause remanded for new trial.

Reversed and remanded.

Parker, C. J., and Price and Schroeder, JJ., dissent.